## THE BAY OF NAPLES.[1]

### HALL et al. v. THE BAY OF NAPLES.

*(District Court, E. D. New York. November 19, 1890.)*

1. **SALVAGE—FIRE IN OIL CARGO.**
   A vessel, loaded with case oil and ready for sea, caught fire about 12 o'clock at night, while lying anchored in the harbor of New York. A passing tug went to her assistance, at the same time signaling for more help. Her signals collected seven other tugs and a ferry-boat, all of the available boats in the vicinity, and lastly came the police-boat Patrol, which had been sent for by the first tug to arrive. All of these boats pumped water on the fire, and extinguished it at about 5 o'clock in the morning. But 283 out of the 55,600 cases of oil were damaged. The saving to the owners of vessel and cargo, without considering freight, was $81,400. There was no extraordinary labor or exposure or peril to life. *Held*, that the salving vessels should collectively recover $20,000 as salvage.

2. **SAME—IMMINENT PERIL—PROMPTNESS OF SALVORS.**
   At the outset of the fire moments being of the greatest importance, the salvage was divided among the tugs with reference to the time of their arrival at the scene of the fire, and also their capacity for pumping.

3. **SAME—FERRY-BOAT AS SALVOR.**
   When a ferry-boat abandons a regular trip to go to the aid of a vessel in distress, the peculiar nature of her employment is to be considered in determining the amount of her award.

In Admiralty.

Suits by various tugs and a ferry-boat against the ship Bay of Naples and cargo, to recover compensation for salvage services. The different suits were consolidated on motion of claimants.

*Carpenter & Mosher*, for the Moran, the Garlick, and the Pratt.

*Wing, Shoudy & Putnam*, for the Leader, the Talisman, and the Indian.

*Peter S. Carter*, for the Harvey W. Temple.

*McCarthy & Berier*, for the John Sylvester.

*R. D. Benedict*, for the Charm.

*Butler, Stillman & Hubbard*, for claimants.

BENEDICT, J. On the night of September 2, 1889, while the ship Bay of Naples was lying in the harbor of New York, at anchor below Bedloe's

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

island, in the channel, and loaded for a voyage to sea, with a cargo consisting of 55,600 cases of kerosene oil contained in tin cans,—two cans being inclosed in a box of pine wood, and making a case,—fire broke out in the cargo in the between-decks near the fore-hatch. The time when the fire broke out was 11:30 or 11:40, and at this time the tugs that navigate the harbor were laid up fast to the docks for the night. The ship lay where the fire-boats of the corporations of New York and Brooklyn would not go. She was at anchor, and not at dock, and she was in imminent danger of total destruction. Shortly after the fire broke out, it was discerned by the steam-tug Moran, then bound to sea with a vessel in tow. The Moran at once abandoned her tow, and proceeded to the assistance of the ship, at the same time blowing her whistles loudly. Soon she was followed by the following named tugs, which arrived at the ship in the following order: After the steam-tug Moran, at 12:10, came the John Sylvester at 12:15; the Leader and the Talisman at 12:30; the Harvey W. Temple at 1; the Pratt at 1:15; the Indian at 1:30; the Garlick and the Charm at 1:45. All of these tugs were provided with powerful pumps, some having a greater pumping capacity than others, and each commenced to pour water into the ship as soon as possible after arrival, and continued until the fire was extinguished. The Pratt, as soon as she arrived, passed a hawser to the ship, and towed her across the harbor to the flats below Governor's island, and there began to pump water into her. The other eight tugs continued their pumping until 5 o'clock, when the fire was completely extinguished, and the tugs were dismissed. By the fire only 283 of the cases out of 55,600 composing the cargo received any damage. The oil left in the 283 damaged cases filled 211 new cases, so that the actual loss of oil was only 72 cases. It cost to restore the vessel and cargo to its original condition $27,638. The sound value of the vessel was $57,500, and the value of the cargo $51,430, making a total of $108,930. I do not include the freight. The saving to the owners was $81,400. The nine tugs now sue for salvage compensation. Unquestionably the service rendered by the tugs to this ship was a salvage service of a high order. It seems certain that in the absence of these tugs the ship would have been destroyed by fire, or at least scuttled and sunk in deep water. In support of the contention of the claimants that 6 per cent. of the value of the property saved is sufficient compensation, it is said the evidence shows that after the arrival of the Leader, upon the suggestion of the master of the Leader, the blowing of signals was stopped on all tugs. This, it is claimed, shows an intention on the part of the salvors to suppress information as to the distress of the ship for their own benefit, and was an act of bad faith on the part of the salvors, which should greatly reduce their compensation. But as against this fact should be stated the fact that, as soon as the Moran arrived at the ship, she not only blew loud signals, and sent men in their boat to bring the Garlick, but she sent the Temple to notify the police-boat, and all the tugs blew alarm whistles until nine boats had arrived or were on their way to the ship, and, as the result showed, the assistance at hand was sufficient to save the ship. While

the evidence showing the discontinuance of those signals certainly de-
serves attention, still I am of the opinion that it cannot be held in the
present case to prove bad faith on the part of the salvors for the reason
that, at the time the signals were discontinued, the assistance which had
actually arrived or was on the way was sufficient to control the fire and
save the ship. As nothing was gained by the tugs, nor anything lost by
the ship, through the discontinuance of the whistles, I feel able to pass
over the act under the circumstances of this case.

Again, it is said in behalf of the claimants that the result in this case
shows petroleum oil of high grade and in tin cans and wooden cases,
such as this cargo, to be not particularly inflammable, and the peril to
the ship was therefore more apparent than real; but, in my opinion, the
result in this case does not touch the question whether a cargo of petro-
leum packed in cases is highly inflammable or not, but rather shows
what control over fire in a cargo highly inflammable can be obtained by
prompt application of water by powerful tugs.

Again it is said that evidence as to the presence of the police-boat Pa-
trol should largely modify the libelant's estimation of the peril to the
ship. The proofs show that the Patrol, after being notified of the fire
by the Temple, started for the ship, but passed her, and did not arrive
along-side of her until 1:45. Before the Patrol arrived, the vessel had
grounded on the flats, and, although the fire was still burning in her, it
was under complete control, and was certain to be entirely extinguished
by the tugs. The Patrol was a powerful fire-boat, and by throwing three
of her eight streams into the ship she no doubt hastened the end, but
no more. In this case, therefore, the proofs show that the police-boat
furnished no substantial assistance to the ship, and her presence cannot
affect the salvage.

Again, it is said the service involved no peril to life or to the tugs
themselves. They did nothing but pump, and they were constructed
to do that. It is not to be denied that the service in question was ren-
dered without peril, and without any extraordinary exertion. The time
occupied was five hours. The weather was fair. There was no extra-
ordinary labor, nor any exposure, nor peril to life. These considera-
tions must, of course, tend to diminish the amount of the salvage
award. Nevertheless, the service rendered was voluntary; it was rendered
promptly to a ship in great danger; and it was eminently successful,
and should be compensated by a liberal amount. The fact of control-
ling importance in determining the amount of award is the danger to
which the vessel was exposed. Here a peculiar danger arose out of the
time when the fire broke out. If the fire had broken out in the day-
time, the first signal from the ship, situated where she was, would have
literally filled the surface of the water about her with tugs willing and
able to aid. But this fire broke out at a time when the tugs are laid up,
and scarcely a vessel about, except a few ferry-boats; and, with fire in
such a cargo as this, it was a question of minutes. It may well be be-
lieved that a delay of 30 minutes in obtaining aid would have given the
fire a headway that would have put it beyond control. As it was, the

master expressed the opinion that the fire would in the end prevail over the tugs. I also am pleased to notice and approve the harmony that was maintained between the different tugs in their united efforts to save the ship, and their desire to remove dispute as to the facts shown by the memorandum of the times of their respective services which was signed by all the masters of the tugs. Taking all things into consideration, I am of the opinion that this ship and cargo should pay a salvage of $20,000. I do not think that the freight should be taken into consideration. In regard to the proper distribution of this amount among the various salvors, I mention some circumstances that have led me to divide the salvage among the various boats in the manner hereafter stated. The circumstances of the ship were such that, at the outset, moments,—seconds even,—were of the greatest importance; and I consider, therefore, the time of the arrival of each tug. The necessity of the ship was a great quantity of water pumped into her in a short time. I consider therefore not only the time at which each tug arrived, but also her pumping capacity. I notice also that Capt. Cahill, of the Moran, to a certain extent, assumed direction of the efforts to save the ship, and exercised good judgment in so doing. And I consider that, when a ferry-boat abandons a regular trip to give aid to a ship in distress, the nature of the ferry-boat's employment, the inconvenience that arises from leaving a regular trip, the danger of complaint by passengers in case she does so, are things to be noticed in determining the amount of her award. In view of all the circumstances, I am of the opinion that to the owners and crew of the tug Moran should be awarded the sum of $4,000. The Sylvester was a ferry-boat worth $60,000, a sum far exceeding the value of any other of the vessels engaged, and from her construction more exposed to danger from fire than any. To the owners and crew of the Sylvester I award the sum of $3,000. To the owners and crew of the Leader I award the sum of $2,500. To the owners and crew of the Talisman I award $2,500. To the owners and crew of the Indian I award $2,500. The Charm, a tug of greater capacity for pumping than any other tug, arrived after the ship had grounded. To her owners and crew I award $2,000. To the owners and crew of the tug Garlick I award $1,500. The tug Temple was the fifth boat to arrive. Her pumping machinery soon broke down. She was absent for a time, having gone to notify the Patrol, a service of no value to the ship, as things turned out. To her owners and crew I award $1,000. And to the owners and crew of the Pratt, which did the towing, I award $1,000.